UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


UNITED STATES OF AMERICA,          )
                                   )
                    Plaintiff,     )   No. CV 10-6115 R
                                   )   No. CR 03-398 R
          vs.                      )
                                   )
GALEB MIZYED,                      )
                                   )
                    Defendant.     )


TRANSCRIPT OF PROCEEDINGS

THE HONORABLE MANUEL L. REAL, U.S. DISTRICT JUDGE PRESIDING

LOS ANGELES, CALIFORNIA

APRIL 26, 2011


EVIDENTIARY HEARING


BRIDGET R. MONTERO, CSR 10020, RMR, CRR
United States Courthouse
312 North Spring Street, Room 435
Los Angeles, California 90012
www.bridgetmontero.com
Internal File No. 11034

```
 1   APPEARANCES OF COUNSEL:

 2

 3   For the Plaintiff:

 4

 5   Office of the United States Attorney
     BY:  CHRISTOPHER BRUNWIN
 6   U.S. Courthouse
     312 North Spring Street
 7   Los Angeles, CA 90012

 8

 9   For the Defendant:

10

11   Law Offices of Ronald Richards
     BY:  RONALD RICHARDS
12   P.O. Box 11480
     Beverly Hills, CA 90213
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                            INDEX

 2

 3                                    D     X    ReD    ReX

 4   For the Defendant:

 5

 6   GALEB MIZYED                     9    13    14

 7

 8

 9

10

11                       EXHIBIT INDEX

12         Exhibit No.                Received

13

14            1                        16

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              TUESDAY, APRIL 26, 2011; 10:08 A.M.

 2                       - - - - -

 3

 4              THE CLERK:  Item No. 1, CV 10-6115, related to

 5    CR 03-398, United States of America v. Galeb Mizyed.

 6              Counsel.

 7              MR. BRUNWIN:  Christopher Brunwin for the United

 8    States.  Good morning, Your Honor.

 9              MR. RICHARDS:  Good morning, Your Honor.  Ronald

10    Richards for the moving party, Galeb Mizyed.

11              THE COURT:  This is your motion.

12              MR. RICHARDS:  Thank you, Your Honor.  I

13    appreciate it.

14              Your Honor, the government and I discussed prior

15    to the hearing just a parameter issue.  It's the defense's

16    position that the improper legal standard, as to the

17    application to the safety valve, was considered at the

18    sentencing hearing by the Court weighing Mr. Mizyed's trial

19    testimony which then ultimately the defendant to whose trial

20    he was testifying in, Ms. Jackson, that conviction was

21    reversed.

22              So if the Court is considering adopting our legal

23    error, then we would request that Mr. Mizyed just be

24    re-sentenced -- or the sentence be modified, I'm sorry, to

25    the guideline of 33, which would be 135 months.  It would
```

1   just be modified.

2           THE COURT:  I don't see that there was any error,

3   as a matter of fact.  I think Judge Takasugi at the trial,

4   at the time of sentence, and at the 2255 heard the defendant

5   and made the determination against him.  And I don't

6   think -- Judge Takasugi is one who would give a defendant

7   any break he could give him under the law, and it just

8   wasn't done.  And I don't see any legal error here and

9   there's certainly no factual error.

10          As a matter of fact, as a second 2255, it's

11  improper.  So I don't -- I don't see that.  I put it on for

12  an evidentiary hearing because I wanted to see if there was

13  something that I might have missed in the record, but the

14  record is pretty clear.

15          MR. RICHARDS:  With all due respect, Your Honor,

16  this is not a second 2255.  This is his first 2255.  So if

17  that's what the Court was believing, I would agree that the

18  Court would be as disturbed as I would in bringing a second

19  2255.  This is the --

20          THE COURT:  Whether it's the first or the second,

21  the record is clear; the record is very clear that Judge

22  Takasugi did not intend to give this defendant the benefit

23  of the lesser sentence, which he could have done.

24          MR. RICHARDS:  I will tell the Court one thing

25  Judge Takasugi didn't have at his disposal, and what the

1    basis of the deficient counsel argument was, was that

2    counsel for Mr. Mizyed didn't point out to Judge Takasugi

3    that the evidence submitted by the government, which was

4    merely the trial testimony, would be an insufficient basis

5    to disallow the safety valve.  And then Judge Takasugi also

6    did not have the benefit of the Ninth Circuit reversing

7    Ms. Jackson's conviction as to -- on an insufficiency of the

8    evidence.

9         THE COURT:  Judge Takasugi had this man before

10   him.  He sentenced him.  He knew what the situation was.  He

11   didn't need any other testimony, as such.

12        MR. RICHARDS:  I would agree with the Court except

13   that, unfortunately, Judge Takasugi in his order said that

14   the reason why he wasn't going to give the safety valve was

15   because of the fact that Mr. -- he based it on Mr. Mizyed's

16   trial testimony; no other evidence.

17        The proffer was never admitted into the record

18   during the sentencing hearing because his lawyer was

19   deficient and never asked the government or the Court to

20   apply the correct standard, which is to only rely on the

21   statements that are given to the government.

22        Now what we have is the government playing sort of

23   a legal hopscotch by presenting the proffers to the Court

24   now and saying, Well, he forgot to tell us about his

25   girlfriend's involvement.  And that's what I would like to

```
 1    have the evidentiary hearing on, to show the Court that --
 2    that had the -- Judge Takasugi only considered the proffer
 3    that was made to the government.  There was no
 4    misstatements.  My client's been truthful about this the
 5    whole time.
 6              THE COURT:  Counsel, the record is clear.  I think
 7    the record is clear.
 8              All right.  You can put on whatever you want, but
 9    the record is clear.  I would not change it now, on the
10    record that I have before me.
11              MR. RICHARDS:  Okay.  So I'll -- based on those
12    statements, then I'm going to call Mr. Mizyed to the stand
13    to just simply clear up the record on the issue of the
14    proffer session that was submitted in the sur-reply brief of
15    the government, that the Court allowed us to brief the
16    single issue, whether or not statements made in court could
17    be used to disallow the safety valve versus statements made
18    directly to the government.  That's sort of the real tight
19    issue that we have in front of Your Honor.
20              THE COURT:  All right.
21              MR. RICHARDS:  Thank you.
22              THE CLERK:  Please raise your right hand.
23              (The oath was administered.)
24              THE WITNESS:  I do.
25              THE CLERK:  Please be seated.  For the record,
```

```
 1    sir, would you please state your full name and spell your

 2    last name.

 3                 THE WITNESS:  Yes.  Full name is Galeb; last name

 4    is Mizyed, M-I-Z-Y-E-D.

 5                 MR. BRUNWIN:  Your Honor, may I approach

 6    Mr. Mizyed and show him a document so I can identify it,

 7    please?

 8                 THE COURT:  Give it to the clerk for him to

 9    mark --

10                 MR. RICHARDS:  Well, I didn't want to mark it.  I

11    just --

12                 THE COURT:  -- for this proceeding.

13                 MR. RICHARDS:  I didn't want to mark it yet.

14                 THE COURT:  Well, then you don't show it to him

15    unless it's marked in evidence or for identification.

16                 MR. RICHARDS:  Okay.  All right.  That's fine.

17    I'll -- I'll mark a document.  It's part of this Court's

18    record.  That's why I didn't want to mark it.  But I'll mark

19    it.  It's document 1510 filed on 1-14-11.  It's a report of

20    investigation.  It's 12 pages.

21                 THE CLERK:  No.  Go around.

22                 And what exhibit number is it?

23                 MR. RICHARDS:  It will just be Exhibit 1.

24                 THE COURT:  For this purpose.

25                 MR. RICHARDS:  For this purpose.  I just wanted to
```

1  show the --

2          THE CLERK:  Defendant's Exhibit 1 before the

3  witness.

4

5                    GALEB MIZYED,

6  called as a witness in behalf of the Defendant, having been

7  first duly sworn, is examined and testifies as follows:

8

9                  DIRECT EXAMINATION

10 BY MR. RICHARDS:

11 Q.   Mr. Mizyed, can you please take a look at that proffer

12 report, identified as Exhibit 1 that I read to you chapter

13 and verse?  If you can take a look at that.

14          Is that -- the report reflective of the interview

15 you did on January 14th, 2005?

16 A.   Yes.

17 Q.   And was that a proffer session that you went to see the

18 government in connection with the potential safety valve?

19 A.   Yes.

20 Q.   And when you saw the government during that proffer

21 session -- the report that was made, it seems like you spoke

22 about a lot of different people.  Is that correct?

23 A.   Correct.

24 Q.   And were you truthful during that proffer session?

25 A.   Yes, I was.

1    Q.    Now, in the government's sur-reply papers, they

2    indicated during that session that somehow you shielded a

3    woman by the name of Mieko Jackson from that proffer

4    session.  Do you know who that is?

5    A.    Yes, I do.

6    Q.    And can you tell the Court -- who is that?

7    A.    It was my girlfriend at that time.

8    Q.    And at the time, you gave testimony or statements about

9    a lot of different people that were actively engaging in

10   trafficking pseudoephedrine as their business.  Is that

11   correct?

12   A.    Correct.

13   Q.    And did the government ever express any interest to you

14   during that proffer session that they were looking into

15   Mieko Jackson for being involved in trafficking of

16   pseudoephedrine?

17   A.    No, not on that date at all.  Never.  In fact, none of

18   my proffers they were interested in Mieko Jackson, or even

19   brought her up.

20   Q.    And if -- when you testified -- when Mieko Jackson's

21   name -- when you spoke to the government -- strike that.

22          You had a visit from Mieko Jackson's attorney

23   during her trial.  Is that correct?

24   A.    That's correct.

25   Q.    And did you ever make any offers to the government

1    about helping to get Ms. Jackson to plead to money

2    laundering?

3    A.    Yes, I did.  I spoke to at that time David Katz, my

4    attorney, to speak to Mr. Hernandez concerning getting to

5    talk to Mieko's -- Jackson, to get a conviction under the

6    money laundering, the money that she was getting from me at

7    that time.

8    Q.    Okay.

9    A.    And that's what I believed that she did.

10   Q.    Did you ever advise Ms. Jackson's lawyer that you felt

11   that she was aware that the money she was receiving was from

12   something illegal?

13   A.    Yes.  When he came and visit me, I stated to him, I

14   said, You know she accepted money.  I never initiated, ever

15   told her, or showed her anything that I've done, but it

16   was -- it was common sense that it was illegal what I was

17   doing; and the money that she was receiving, it was from

18   illegal proceedings.

19   Q.    Did you ever have any reason, though, to discuss with

20   Ms. Jackson the specifics of how you were earning this

21   money?

22   A.    No, not at all.  I have no reason to.

23   Q.    And was she the type of girl that you would want to

24   share these type of serious issues with, that could

25   jeopardize you in the future?

```
 1   A.    No.  She wasn't the type for me to even -- it wasn't no

 2   reason for me to even talk to her concerning the proceedings

 3   that I was doing, the illegal activities that I was doing.

 4   Q.    And if the government during that proffer session, if

 5   they had asked you whether Ms. Jackson had received any

 6   money from you, would you have any hesitation to tell them

 7   about it?

 8   A.    No.  I did.

 9   Q.    And with respect to all the people that you named, it

10   seemed like you named dozens of people during

11   that proffer --

12            THE COURT:  No.  Don't lead the witness and don't

13   you testify, Counsel.

14            MR. RICHARDS:  All right.  I apologize, Your

15   Honor.

16   BY MR. RICHARDS:  (Continuing)

17   Q.    During the proffer session, did you name a lot of

18   individuals?

19   A.    True.  Yes.

20   Q.    All right.  And did you have any motive at all to --

21   let me strike that.

22            Were you aware that Ms. Jackson was offered a

23   money laundering charge?

24   A.    I believe --

25            MR. BRUNWIN:  Objection.
```

```
 1              THE WITNESS:  -- her attorney telling me that, but
 2    I think it was too late.
 3              MR. BRUNWIN:  I object as lacking foundation and
 4    calls for hearsay.
 5              THE COURT:  Objection sustained.
 6    BY MR. RICHARDS:  (Continuing)
 7    Q.  Did you have any motive at all during that
 8    January 14th, 2005, proffer session --
 9              MR. BRUNWIN:  I'm going to object as irrelevant as
10    to his motive.  He said what he said.
11              THE COURT:  Objection sustained.
12              MR. RICHARDS:  Okay.  I have no further questions.
13              THE COURT:  Cross-examination?
14                        CROSS-EXAMINATION
15    BY MR. BRUNWIN:
16    Q.  Mr. Mizyed, you testified that you discussed a lot of
17    people in the proffer in 2005.  Is that right?
18    A.  Correct.
19    Q.  And there's no indication -- you didn't bring up --
20    there's no indication that you brought up Ms. Jackson in the
21    proffer or discussed that, correct?
22    A.  That particular date, no, sir.
23    Q.  Very well.
24              And you said -- testified that you spoke to
25    Ms. Jackson's lawyer about Ms. Jackson.  That's correct,
```

1  isn't it?

2  A.   Yes.

3  Q.   But that was a conversation with Ms. Jackson's lawyer

4  and not with the government, correct?

5  A.   When he came and visit me, it was his -- yeah,

6  Mrs. Jackson's lawyer.

7  Q.   There was nobody from the government present during

8  that conversation, correct?

9  A.   No.

10  Q.   And the proffer conducted in 2005, that was before your

11  trial testimony in 2006.  Is that right?

12  A.   Correct.

13        MR. BRUNWIN:  Nothing further, Your Honor.

14        THE COURT:  Redirect?

15        MR. RICHARDS:  Thank you, Your Honor.

16              REDIRECT EXAMINATION

17  BY MR. RICHARDS:

18  Q.   Now, Mr. Mizyed, directing your attention to the

19  January 14th, 2005, proffer, did the government ever

20  specifically ask you about Mieko Jackson during that

21  proffer?

22  A.   No, sir.

23        MR. BRUNWIN:  I'm going to object as irrelevant.

24  It's not --

25        THE COURT:  The objection is sustained.  It's

1    irrelevant.

2    BY MR. RICHARDS:  (Continuing)

3    Q.   Did the government -- was that a -- did the government

4    ever specifically give you instructions that you had to

5    discuss individuals that they didn't ask you about?

6            MR. BRUNWIN:  Same objection, Your Honor.

7            THE COURT:  Objection sustained.

8            MR. BRUNWIN:  It's the defendant's burden on a

9    safety valve proffer.

10           THE COURT:  Objection sustained.

11   BY MR. RICHARDS:  (Continuing)

12   Q.   Again, I'll just ask you:  Based on what you told the

13   government on that day, was there anything that was

14   untruthful based -- in that report that's Exhibit 1?

15   A.   I spoke the truth on that day.  And every time I

16   proffered, I spoke the truth.

17           MR. RICHARDS:  All right.  Thank you, Your Honor.

18   No further questions.

19           MR. BRUNWIN:  Nothing further, Your Honor.

20           THE COURT:  Step down.

21           Anything further?  Anything from the government?

22           MR. BRUNWIN:  No, Your Honor.

23           THE COURT:  I'll hear you, whatever you want to

24   argue now.

25           MR. RICHARDS:  Thank you, Your Honor.

1          Your Honor, I believe in our briefs we showed the

2     Court that there was -- that Judge Takasugi violated the

3     case of *United States v. Jeffers* by applying a standard

4     which ended up in a result that disallowed the safety valve.

5               As you saw from the short evidentiary hearing, my

6     client gave a proffer session.  There's nothing in the

7     report that's in evidence that suggests -- Your Honor, just

8     for the record, can I move that report into evidence?  It's

9     already filed in the case as part of the government's

10    sur-reply, but just for technicalities --

11               THE COURT:  Any objection?

12               MR. BRUNWIN:  No objection, Your Honor.  That was

13    attached to the government's sur-reply.

14               THE COURT:  1 in evidence.

15               (Exhibit 1 received.)

16               MR. RICHARDS:  Thank you.

17               The report -- the report, Your Honor, if the Court

18    goes through it, there's no mention -- when the government

19    asked an interviewee about a suspect that they're

20    investigating, the name is capitalized, and there's no

21    paragraph in the report that says we have a question about

22    Mieko Jackson, what's her involvement, and the defendant

23    denied her involvement.

24               THE COURT:  The proffer is for a defendant to come

25    forward to the government, to get something from the

1    government, a recommendation from the government for a

2    lesser sentence, Counsel.  There's no obligation on the

3    government to -- to ask any questions.

4            MR. RICHARDS:  No.  I know.  But I just want to

5    point out to the Court a critical distinction.  For a safety

6    valve, he's only required under 5C1.2, subsection (a)(5), to

7    talk about his role in the offense.  He's not required to

8    bring everybody's name that could have been involved.

9            We're only here on a safety valve.  I'm not here

10    on a 5K complaint.  And so --

11            THE COURT:  He only has to talk about himself, and

12    then you say that he should have been credited for not

13    talking about somebody else.

14            MR. RICHARDS:  No, Your Honor.

15            THE COURT:  Come on, Counsel.  Please don't do

16    that.

17            MR. RICHARDS:  No, Your Honor.  I'm just saying

18    that he shouldn't have been denied the benefit of the safety

19    valve because he didn't volunteer --

20            THE COURT:  Judge --

21            MR. RICHARDS:  Judge what?

22            THE COURT:  Judge Takasugi had well in mind the

23    question of a safety valve, and he didn't do it.

24            MR. RICHARDS:  I agree --

25            THE COURT:  It's a correct, it's a correct

 1  decision by Judge Takasugi, without question.

 2          MR. RICHARDS:  Your Honor, it's almost

 3  embarrassing that -- knowing Judge Takasugi as well -- not

 4  as close -- as well as you do, but that I'm arguing about

 5  something that he didn't do, but it's really a legal issue

 6  that if Judge Takasugi -- if Mr. Mizyed's lawyer would have

 7  simply said, Judge Takasugi, this is the wrong standard, I

 8  want you to go to the proffer session on January 14th, and

 9  then we just heard uncontroverted evidence that Mr. Mizyed

10  did not testify untruthfully during that proffer session,

11  that's the issue.  That's the evidence that should be

12  considered.  Not what he said at trial based on a 5 -- based

13  on the safety valve.

14          It's just a mild mistake that could easily be

15  corrected.  That's why we have the secondary layer of

16  process, because we were able to discover the error, and

17  then, now that we've had the evidentiary hearing, the Court

18  saw that all Mr. Mizyed did is respond truthfully to the

19  questions asked of him, and there's no evidence that he was

20  untruthful to the government on that day.

21          The fact that -- the government's only response in

22  their sur-reply brief was he didn't volunteer his

23  girlfriend.  He shielded her from this proffer session.

24  Well, his obligation on that day was to talk about himself.

25  He answered, though, every single question they asked him,

1    and there's been no evidence in the hearing, now that it's

2    closed, that --

3            THE COURT:  You're just going round and round to

4    the same thing.  That's the third time that you've talked

5    about that.

6            MR. RICHARDS:  Well, because it's a sharp

7    distinction, Your Honor, and I just want to make sure that

8    the Court is on the same page as what I'm trying to have

9    adjudicated.

10           THE COURT:  The record is clear --

11           MR. RICHARDS:  All right.

12           THE COURT:  -- that Judge Takasugi went right, in

13   not giving the -- the safety valve.

14           MR. RICHARDS:  Well --

15           THE COURT:  From what I've heard of the defendant,

16   and read the record, I would not give him that either.

17           MR. RICHARDS:  Well, that was the whole -- that's

18   sort of the legal objection that we have, is that the record

19   shouldn't be the record of the trial; it should be the

20   record of what you just heard now as to the proffer session.

21   And there's no evidence that he said anything untruthful.

22           That's our exclusive objection, Your Honor, is

23   that because the Court considered the discrepancy between

24   the witnesses at the trial, we were -- evidence that was --

25   shouldn't have been considered was in fact considered, and

1    that prejudiced Mr. Mizyed because his lawyer didn't point

2    out the legal error.  And it may have been different if

3    Judge Takasugi only considered the proffer session on

4    January --

5              THE COURT:  His testimony here is self-serving,

6    after the fact, Counsel.

7              MR. RICHARDS:  But I'm only responding to his

8    testimony, respectfully, Your Honor, to what the government

9    suggested, that he was untruthful, and I gave him -- he was

10   here to be cross-examined so we could actually have the

11   appropriate sentencing hearing that never was had before --

12   I mean, the evidentiary hearing on the session of whether he

13   was untruthful.

14             But I think that if the Court's going to consider

15   the trial record as part of that nucleus, then it would

16   be -- it would be the same sort of problem that Judge

17   Takasugi ran into, and that's -- that's all I'm trying to

18   point out to the Court.  I don't think anybody is

19   disputing -- no one is suggesting that Mr. Mizyed was

20   untruthful in his proffer.  The suggestion is that he

21   omitted his girlfriend's involvement, but I just showed the

22   Court he was --

23             THE COURT:  I've heard that now for the fifth

24   time, Counsel.

25             MR. RICHARDS:  But that's really the only issue,

1   Your Honor.

2           THE COURT:  All right.  Saying it five times

3   doesn't help it at all.

4           MR. RICHARDS:  Sorry, Your Honor.

5           THE COURT:  All right.

6           MR. BRUNWIN:  Your Honor, if I may, first of all,

7   I want to go to actually the standard for safety valve

8   relief under Section 5C1.2.  And I believe the Court is

9   certainly well aware, and I'm sure defense counsel is well

10  aware, that Section 5C1.2, subsection (a)(5), provides that

11  in addressing the issue of the defendant's burden is that

12  not later than at the time of sentencing, which is far in

13  advance of today's date, the defendant has truthfully

14  provided to the government -- and I think the pertinent

15  portion is, all information and evidence the defendant has

16  concerning the offenses -- the offense or offenses that were

17  part of the same course of conduct or the common scheme or

18  plan.  And by this defendant's own account, he did not do

19  that.

20          Defense counsel's questions directed to what he

21  asked, what he -- what the government's interest was, is --

22  is immaterial to his burden to establish his right to -- or

23  the possibility of relief from the mandatory minimum under

24  the safety valve.  And what's significant in this case is

25  that he apparently -- and when defense counsel started

1    asking him questions, he talked about the desire to shield

2    his one-time girlfriend from the discussion.  Regardless of

3    what his motivation may have been, the topic of her was not

4    discussed.  And then later at trial, in what was in front of

5    Judge Takasugi was a record of this defendant having given

6    untruthful responses that the Court evaluated based upon the

7    record of the trial testimony that Judge Takasugi heard,

8    which included this defendant's testimony, the testimony of

9    the defendant -- co-defendant, Mieko Jackson.

10           And specifically what Judge Takasugi and also the

11   Ninth Circuit credited is the testimony of co-defendants --

12   of David Wallace and Miguel Sarabia, and the fact that that

13   testimony contradicted the testimony of this defendant at

14   trial.

15           Counsel's attempt to site to and rely on the

16   *Jeffers* case is inapposite because in *Jeffers*, what you had

17   is a scenario where a defendant -- the factual basis in

18   which a defendant perjured himself at trial and then sought

19   to amend that in a subsequent meeting with the government.

20   There was no subsequent meeting.  That didn't happen here.

21   That is not this scenario.

22           The idea that Judge Takasugi didn't have a full

23   record to base his -- or should not have relied on the trial

24   testimony of this defendant at trial is just not supported

25   by -- certainly by the *Jeffers* case.  I think if you infer

1    from the *Jeffers* case that had the defendant not proffered
2    after his perjured testimony, he would only have perjured
3    testimony.  Defendant's argument that testimony at trial is
4    only speaking to his attorney, only answering questions from
5    his attorney, is just patently and facially absurd.
6            I think -- addressing defendant's points with
7    regard to the argument, this is defendant's attempt to bring
8    a petition under 2255 and the argument for ineffective
9    assistance of counsel based upon the purported need for an
10   evidentiary hearing.  I don't think that there's anything
11   that the Court has heard today which supports the conclusion
12   that an evidentiary hearing was necessary or would have
13   contributed anything to the Court's determination prior to
14   the sentencing in this matter because there's nothing --
15   there's nothing different.  The Court had a record of his
16   testimony and his false statements, which were subsequent to
17   the trial -- or to the proffer session in 2005, in this
18   matter.
19           Counsel makes reference to the appeal of Mieko
20   Jackson and stated that her conviction was reversed.  It was
21   not reversed in total.  Her money laundering conviction was
22   affirmed, so that does not change the equation, and it
23   supports the conclusion that the testimony as to her
24   involvement, her knowledge of the offense, her knowledge of
25   the illegal nature of the conduct, was supported.

1           And specifically the Ninth Circuit, just as Judge

2    Takasugi did, relied on and cited to the testimony of David

3    Wallace and Miguel Sarabia which, for lack of a better term,

4    put the lie to this defendant's testimony at trial.  Again,

5    his argument that that testimony at trial was really only a

6    response to questions by counsel is just without merit.

7           And with that, the government submits that

8    defendant's petition for a 2255 -- defendant's 2255 petition

9    should be denied.

10           MR. RICHARDS:  Can I respond to that, Your Honor?

11           THE COURT:  Yes, you may.

12           MR. RICHARDS:  Thank you.

13           To clear up something for the record, it wasn't

14    Mr. Galeb Mizyed's attorney that was asking the questions at

15    trial; it was Mieko Jackson's attorney.  He was subpoenaed

16    in the offensive testimony that the government came out

17    during her direct.

18           It was Mr. Katz that fell below the standard of

19    care and had the deficient performance at the sentencing

20    hearing because had Mr. Katz focused Judge Takasugi on the

21    issue, he would have then, one, attempted to have a proffer

22    session with the government to correct any issue that may

23    have occurred as to whether or not he was -- untruthfulness;

24    the government would have had to respond and say, Wait, we

25    only think he was untruthful at trial; or they would have

1    said, We also think he was untruthful in the January 14th

2    proffer session.  And this could have been cleared up before

3    the sentencing so he would have been able to have the

4    benefit of *Jeffers*, which said that if there's a -- *Jeffers*

5    was an extreme case of perjury.  I don't think -- there was

6    never an indication by anybody or any sort of claim or

7    obstruction enhancement that Mr. Mizyed committed perjury.

8    There was -- the difference was between him and one

9    informant, David Wallace, as to one or two discrete acts.

10           But it wasn't enough for the Ninth Circuit to find

11   that, to hold Ms. Jackson's conviction for aiding and

12   abetting the manufacture of methamphetamine.  Mr. Mizyed has

13   never denied that she received money from him or denied that

14   he didn't corroborate the fact that she should be found

15   responsible for money laundering.  That's a completely

16   different issue.  Her trial dealt with a much more serious

17   offense with the mandatory minimum.

18           And in this case, Your Honor, it's not the

19   mandatory minimum that I'm asking the Court to do at this

20   point.  I'm merely just asking that he get the two levels

21   for the safety valve, which adjusts him two levels on the

22   guidelines.  The mandatory minimum is not what I'm really

23   seeking.  I'm just asking that he get the benefit of those

24   two levels because of counsel's deficient performance.

25           I was hoping the government was just going to

1   stipulate to the two levels because it was obvious that
2   because of Mr. Katz's deficient performance, the proper
3   standard was not placed in front of Judge Takasugi.  And if
4   nobody is arguing on behalf of the defendant and focusing
5   the Court on the correct standard, which would have been to
6   look at the proffer this Court has just looked at, Judge
7   Takasugi, who was one of the best judges I've ever had the
8   pleasure of being in front of, would have maybe then changed
9   his mind because he would have seen that the proffer that
10  Mr. Mizyed did give on January 14th, there was nothing in
11  the proffer that was untrue.
12          And simply not disclosing something that was never
13  asked is not a violation of the safety valve requirements,
14  and that's what the issue is in front of this Court, is that
15  because of the deficient performance by Mr. Katz, the issue
16  was never properly put before the government.  And the
17  defendant is now prejudiced because he never had an
18  opportunity to fix this error because his lawyer was
19  deficient in his job, in properly applying the legal
20  requirements for the application or disallowance of the
21  safety valve adjustment, and that's really what happened
22  here.
23          THE COURT:  All right.
24          MR. BRUNWIN:  Your Honor, defense counsel
25  repeatedly avoids the issue of the fact that Judge Takasugi

```
 1   weighed the trial evidence he heard, and he --
 2            THE COURT:  He went all through it in the record.
 3   He went all through the evidence, talked about it.  Mr. Katz
 4   argued that the -- argued the safety valve completely and to
 5   a terrible end, and Judge Takasugi did just not accept it.
 6   And I think the record shows that he could legally do that,
 7   and that's what he did.  And I would have done the same
 8   thing, and I do the same thing here again.  Just hearing the
 9   self-serving statements of the defendant don't change that
10   record at all.
11            MR. BRUNWIN:  Yes, Your Honor.  And I think what's
12   also very clear is that Judge Takasugi weighed and made
13   credibility determinations as to --
14            THE COURT:  Absolutely.
15            MR. BRUNWIN:  -- to the testimony of certain
16   defendants.
17            THE COURT:  It's very clear.
18            MR. BRUNWIN:  Yes, Your Honor.
19            THE COURT:  Prepare the findings of facts and
20   conclusions of law setting forth all of the conclusions that
21   Judge Takasugi considered in terms of the safety valve.
22            MR. BRUNWIN:  Yes, Your Honor.
23            THE COURT:  The motion is denied.
24            All right.  We're in recess.
25            (Proceedings concluded at 10:38 a.m.)
```

1                    C E R T I F I C A T E

2

3           I hereby certify that the foregoing is a true and

4    correct transcript from the stenographic record of the

5    proceedings in the foregoing matter.

6

7    /s/Bridget R. Montero
     Bridget R. Montero              Date:  May 12, 2011
8    Official Court Reporter
     CSR No. 10020
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25